UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA BITTI,                                    Case No.

        Plaintiff,                      Hon.

v.

ONESTREAM SOFTWARE, LLC,

        Defendant.
_____

Bayan M. Jaber (P85451)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI, 48067
(248) 398-9800
bjaber@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com
_____

**PLAINTIFF'S COMPLAINT AND JURY DEMAND**

Plaintiff, Linda Bitti ("Bitti"), by and through her attorneys, Pitt McGehee

Palmer Bonanni & Rivers P.C., files the following Complaint against Defendant,

OneStream Software, LLC, ("OneStream" or "Company") and states as follows:

## **INTRODUCTION**

Linda Bitti, a seasoned finance and accounting expert, was terminated from her employment at OneStream Software, LLC for alleged poor performance 32 days after returning from an FMLA-qualifying leave.

Bitti excelled at OneStream for nearly three years until her FMLA leave. She enjoyed glowing performance reviews, leadership training opportunities, and received internal awards and recognitions from management and colleagues alike. In January 2023, the Company even promoted Bitti to a managerial role crafted specifically for her skillset.

In March 2023, Bitti was placed under the supervision of a new manager, Jessica Vitulano. Vitulano treasured and regularly praised Bitti's expertise, until Bitti was diagnosed with a degenerative muscular and spinal condition in May 2023, necessitating surgery. Upon being informed that Bitti's serious medical condition would require time away from work, Vitulano's demeanor towards Bitti devolved drastically. Furthermore, Vitulano repeatedly failed to inform Bitti that her serious medical condition was FMLA-qualifying.

Thirty-two days after Bitti returned from surgery, OneStream terminated Bitti. The Company relied on alleged performance issues as pretext to justify the retaliatory and discriminatory termination. In reality, the Company terminated Bitti's employment because she chose to take FMLA-qualifying leave and because the Company regarded Bitti as possessing a disability. The "poor performance" justification is further belied by the fact that following her termination, HR informed Bitti that she was eligible for rehire within the company.

In addition to terminating Bitti because she took FMLA-qualifying leave and because OneStream regarded her as disabled, the Company denied Bitti an opportunity to reap the rewards of her new promotion, which included annual bonuses, annual raises, and full benefits.

Bitti brings this action against OneStream to be reinstated to her rightful position with the Company, and that she be adequately compensated for her economic and non-economic loss.

## JURISDICTION, VENUE AND PARTIES

1.      This wrongful discharge case is based on retaliation in violation of the Family and Medical Leave Act ("FMLA"), 29 USC §2601 *et seq.* and perceived disability discrimination in violation of the Michigan's Persons with Disabilities Civil Rights Act ("PDCRA"), MCL 37.1201, et seq. Plaintiff was terminated from employment with OneStream in retaliation for pursuing her rights under the FMLA, and because the Company perceived her as possessing a disability.

2.      The Court has federal question jurisdiction over this controversy to enforce the provisions of the FMLA. 28 U.S.C. §1331.

3.      This Court also has supplemental jurisdiction under 28 U.S.C. § 1367 to address the claims brought under Michigan's PDCRA because they are so related to the federal law claims that they form a part of the same case or controversy.

4.      Bitti is a former employee of OneStream, and was at all times relevant to this action, a resident of Macomb County, and is thus a resident of the Eastern District of Michigan.

5.      OneStream is a Michigan limited liability corporation with headquarters in Oakland County in the State of Michigan. OneStream transacts business and performs services in the Eastern District of Michigan. OneStream provides a streamlined financial services platform for its corporate clients.

6.      OneStream has over 1,300 employees globally, offices in Michigan, Georgia, Florida, and Colorado, and operates in over 42 countries.

7.      Venue is proper in the Eastern District of Michigan because Defendant is a resident of this district and because a substantial part of the events giving rise to this cause of action occurred in this district and division. 28 U.S.C. §1391(b)(1)(2).

## STATEMENT OF FACTS

8.      Bitti is a highly skilled self-made accounting professional and financial data analyst with more than a decade of accounting experience.

9.      Bitti was hired by OneStream on or about February 10, 2020, as a Customer Success Administrator.

10.     In March of 2020, the company permanently shifted its operations to remote work.

11.     The Company's Customer Success Manager, Barbara Vernarsky ("Vernarsky") specifically recruited Bitti because Vernarsky previously worked with Bitti, and believed that Defendant stood to benefit from Bitti's strong work ethic and high caliber of work.

### LINDA BITTI'S WORK REFLECTS SEASONED FINANCE EXPERTISE

12.     Prior to her recruitment into OneStream, Bitti held various accounting positions from Accounts Receivable to Senior Accountant at well-established businesses throughout Michigan. Bitti's employers spanned a variety of industries

including information technology, advertising, automotive, health and wellness, oil and gas, and cinematic industries.

13.     From July 2006 to December 2008, Bitti worked for EDS, a Hewlitt-Packard company, as the primary Accounts Receivable Analyst where she excelled in all accounting functions.

14.     From June 2009 to September 2010, Bitti worked for Entertainment Publications LLC as the primary Accounts Receivable Analyst where she used her eagle-eye to review, approve, and generate crucial reporting to ensure her employer's financial health.

15.     From September 2010 to January 2013, Bitti worked for Akebono Brake Corporation as the Accounts Receivable Coordinator where she handled at least $25,000,000.00 in accounts per month, researched and implemented a $10,000 cost-savings initiative, and provided production plants with financial assistance to efficiently manage high-volume transactions.

16.     From July 2013 to September 2015, Bitti worked for ViSalus, a health and wellness company, as a Revenue Accountant where she managed at least $500,000.00 in monthly accounting, researched and implemented a $250,000.00 cost-saving initiative, collaborated with IT on a new streamlined reporting system, and was proficient with customer service and communications.

17.     From September 2015 to May 2016, Bitti worked for Tweddle Group, a product-support provider to global original equipment manufacturers, as a Finance Specialist where she worked closely with Senior Financial Analysts and provided root-cause analysis on content development and project management to ensure accuracy, consistency, and confidence.

18.     From September 2016 to March 2017, Bitti worked for Atlas Oil as a Senior Accountant where she actively managed monthly balance sheets, billings, banking, collections, and cash applications for 70 real estate sites.

19.     From December 2017 to April 2019, Bitti worked for Emagine Entertainment Theaters as the primary accountant where she handled all accounting and auditing matters, worked with financial institutions to streamline the company's banking practices, and provided C-Suite personnel with key financial insights during theater constructions.

### June 2019: Linda Bitti's Expertise Earns Recruitment Offer by OneStream

20.     In June 2019, Bitti earned a Dual Masters MBA in Finance and Business Administration from Walsh College.

21.     Bitti applied her advanced degrees to her new role at OneStream as the Company's newly-recruited Customer Success Administrator.

22.     As a Customer Success Administrator, Bitti worked closely with Customer Success Managers to support the Customer Success team identify,

prioritize, and address customer-facing tickets in OneStream's "ServiceNow" ticketing system.

23.     By all measures both qualitative and quantitative, subjective and objective, Bitti excelled at her job from the very beginning. While employed at Defendant, Bitti received several glowing reviews and high praise from Vernarsky and Customer Success Department Supervisors Hein Scholten ("Scholten"), Mark Sims ("Sims"), and others.

24.     In her 2020 Performance Review, Bitti was rated "MEETS EXPECTATIONS" overall in her role as Customer Success Administrator, and received the following praise from Manager Vernarsky and Supervisor Scholten:

a)      "[Linda's] careful watch allows her manager to move on to other tasks without worrying or having to mentor or monitor her."

b)      "[Linda is] fast and accurate which is pretty rare. She works very well with the team and is highly appreciated by them and by others in the company. I hear nothing but praise."

c)      "[Linda's] teammates adore her and both managers adore her positive attitude and willingness to help achieve goals at a moment's notice.

25.     In her 2021 mid-year Performance Review, Bitti was rated "EXCEPTIONAL" overall in her role as Customer Success Administrator, and received the following praise from Manager Vernarsky and Supervisor Scholten:

a)      "Linda has really stepped up to own her role and expand her interaction with customers. This really shows her dedication to your customers…"

b)  "Linda is continuing to grow in the administrator position and has taken on responsibilities and addressed issues without being prompted by her manager."

c)  "[Linda has] been handling an ever-growing workload without dropping the ball on any customer. That's impressive and gives [management] the confidence that this is in good hands."

26.   In her 2022 mid-year Performance Review, Bitti was again rated "EXCEPTIONAL" overall in her role as Customer Success Administrator, and received the following praise from Manager Vernarsky and Supervisor Sims:

a)  "Linda is an instrumental driver of making a bad situation better."

b)  "Linda has more capabilities and skillset that have been limited due to her current role."

c)  "For the remainder of the 2022 year, I would like to start her transition into a new role to begin truly working as a Renewal Specialist."

d)  "Linda's skillset outweighs her current role."

e)  "[Linda] has built great relationships with many colleagues and customers this year and I have personally received many unsolicited positive feedback regarding Linda's work ethic and ability to resonate with people. … I do like to receive unsolicited positive feedback often, so please keep up the great work!"

27.   Bitti's stellar performance, including her "keen eye for customer success," earned a nomination into the esteemed Emerging Leadership Program as part of the Company's 2022 Class. Recognizing Bitti as a true rising star, Manager Vernarsky and Supervisor Sims decided Bitti was an "easy choice" for the program,

which they anticipated would "provide her with the tools she [would] need to face the challenges of a new and more demanding role."

28.    Indeed, Bitti graduated from the Emerging Leadership Program with flying colors, completing her program with great compliments from her mentor and coaches. Bitti was fully engaged, asked questions, and led discussions with fellow cohort members.

29.    In November of 2022, Leadership tapped Bitti for a promotion into the Renewals Manager role in the Revenue Operations Department. The Renewals Manager role was created specifically with Bitti in mind.

30.    As Renewals Manager, Bitti would receive an $80,000.00 salary (a raise from $67,000.00), full benefits, a 10% discretionary yearly bonus, and yearly raises between 1-5% after the first year.

31.    As the Renewals Manager, Bitti would develop and manage collaboration between Internal Teams including Accounting, Sales, Legal, and Revenue Operations to optimize the renewals process and ensure ultimate success of the Customer Success team.

32.    Showing no sign of slowing down in her 2022 yearly Performance Review, Vernarsky rated Bitti "MEETS EXPECTATIONS" overall in her role as Customer Success Administrator. Feedback reflected the high expectations of Bitti as she stepped into the Renewals Manager role in the First Quarter of 2023:

a)   "In 2023, the expectation is for Linda to use that same grit and determination to build a new foundation for the Renewals process and apply her newly gained knowledge … to help the CS Team drive and obtain their goals and objectives for Renewals."

b)   "During the next 6-month period, [Linda] will be able to develop the reporting and forecasting tools needed to drive the CS team to their goals and objectives for the year."

c)   "[Linda] will establish herself with the CS team as their champion for Renewals reporting and forecasting and drive them to achieving their goals and objectives."

33.    In December 2022, Manager Vernarsky awarded Bitti the Constellation Award, thanking Bitti for her skill, dedication, and tenacity:

> "Thank you, Linda, for all of your work while handling the User provisioning program. ***This program was not easy, but you somehow navigated the most complex issues*** and took much time out of your schedule to help others struggling with the process. ***You embody the OneStream cultural values and you were rewarded with the Constellation award which is a peer nominated award.***" (emphasis added)

## BITTI PROMOTED IN JANUARY 2023 AND UNEXPECTEDLY BEGINS REPORTING TO NEW SUPERVISOR IN MARCH 2023

34.    In January 2023, Bitti officially transitioned into the Renewals Manager role, reporting to Vernarsky, who had recently assumed the Senior Manager of Operations supervisor role.

35.    Upon assuming the managerial role, Bitti excelled. Her hard work and adaptability were routinely complimented by Vice President of Revenue Operations Linsay Miller ("Miller").

Page 11 of 24

36.     Miller was so impressed with Bitti's work that Miller awarded her a "WorkTango," a company-wide internal recognition.

37.     In March of 2023, the Revenue Operations Department was reorganized, and as a result, Jessica Vitulano ("Vitulano") replaced Vernarsky as the Senior Manager of Operations.

38.     Vitulano joined OneStream in September 2020, seven months after Bitti's recruitment in February 2020. Vitulano's previous work experience includes serving as a remote Sales Operations Specialist at a handful of software companies. Prior to assuming the Senior Manager of Operations role, Vitulano held a sales operations management role.

39.     Upon information and belief, Vitulano does not possess any educational training in business, finance, accounting, sales, or relevant studies. Nor does Vitulano possess any leadership or people-management training. Rather, Vitulano has three years of university education and a training certificate in Montessori education.

40.     Vitulano became Bitti's supervisor and direct report.

41.     This was Vitulano's first supervisory position.

42.     After Vitulano assumed the position of Senior Manager of Operations, Bitti observed that Vitulano expressed disdain for employees who took time away from work.

43.     Throughout March, April, and May, Vitulano complained to Bitti about a Sales Operations Analyst, Tawni Hanson, for taking time off work for legitimate medical reasons due to chronic shoulder pain and expressed to Bitti that she thought the employee was "lazy," "slow," and "did not want to work."

44.     Bitti nevertheless kept her head down and applied her skill and talent with the same dedication and tenacity she was known for and continued to succeed in her work.

45.     Bitti's relationship with Vitulano was generally positive, with Vitulano complimenting Bitti about her quick-wittedness, adaptability, and ability to ask informed questions.

46.     For example, in April 2023, Vitulano commented that Bitti was a "good fit for the department."

47.     However, Vitulano's demeanor and attitude towards Bitti soon changed dramatically when she observed Bitti had a serious health condition which would require time off from work.

### MAY 2023: BITTI IS DIAGNOSED WITH SERIOUS MEDICAL CONDITION, TRIGGERING IMMEDIATE BACKLASH FROM VITULANO

48.     In the Winter of 2023, Bitti, who has long dealt with arthritis, began to suffer from a series of muscle and spine-related health conditions affecting her lower back.

Page 13 of 24

49.     In April of 2023, Bitti's physical impairment became even more pressing, and she often found herself in unbearable pain impeding her ability to move, sit up, or walk.

50.     On May 1, 2023, Bitti was diagnosed with a series of degenerative muscle and spine conditions, including lumbar spondylosis, lumbar radiculopathy (also known as sciatica), inflammation of the sacroiliac joint, back muscle spasms, and general chronic low back pain.

51.     Shortly thereafter, Bitti consulted with Dr. Jennifer Martin PA-C, and the two discussed an escalating plan of care that ultimately included back surgery to lessen the pressure on Bitti's lower vertebrae.

### JUNE 2023: VITULANO INTERFERES WITH LINDA BITTI'S RIGHTS UNDER FMLA

52.     Bitti kept Vitulano apprised of her ongoing health concerns. In May, she informed Vitulano that she would need time off to tend to her serious health condition to attend various doctors' appointments and procedures.

53.     Vitulano failed to inform Bitti of her right to elect FMLA to cover her anticipated time off requests to tend to her serious medical condition. Instead, Vitulano instructed Bitti to use her banked PTO and Sick Time.

54.     On June 19, 2023, Bitti took pre-approved time off for a doctor's appointment. Bitti verbally submitted this request to Vitulano at least one week in advance, and it was later formally approved by Vitulano in OneStream's system.

55.     On June 21, 2023, Bitti took pre-approved time off for a doctor's appointment. Bitti verbally submitted this request to Vitulano at least one week in advance verbally, and it was later approved by Vitulano in OneStream's system.

56.     With each time-off request, Vitulano and Bitti's work relationship deteriorated. Whereas Vitulano would regularly call Bitti to talk through various tickets and/or projects, Vitulano began sidelining Bitti and giving her the cold-shoulder and silent treatment.

57.     Despite her health concerns and Vitulano's changing demeanor, Bitti maintained her work responsibilities, continued to perform well, and was never informed to the contrary.

58.     On July 17, 2023, Bitti took pre-approved time off for a doctor's appointment. Bitti verbally submitted this request to Vitulano at least one week in advance, and it was later approved by Vitulano in OneStream's system.

59.     On July 17, 2023, following her doctor's appointment, Bitti informed Vitulano that she would need one week off (40 hours) from August 28, 2023, through September 1, 2023, for back surgery.

60.     Vitulano again failed to inform Bitti that she was qualified to elect to take the time off under the Family Medical Leave Act.

61.     Instead, Vitulano again forced Bitti to use her banked Paid Time Off and Sick Days for the requested time off.

62.     Bitti, an amiable employee never having been informed of her rights, obliged Vitulano's instruction without question.

63.     On July 20, 2023, Vitulano reviewed and approved Bitti's time off requests for surgery.

64.     On July 26, 2023, on the same exact day that Bitti was at a pre-approved doctor's appointment, Vitulano emailed her direct supervisor, Vice President of Revenue Operations Miller, a series of alleged performance issues Bitti was allegedly exhibiting.

65.     Vitulano had never previously discussed any performance concerns whatsoever with Bitti.

### JULY 2023 & ONWARDS: VITULANO RETALIATES AGAINST BITTI FOR SUBMITTING AND TAKING TIME-OFF

66.     On August 4, 2023, Vitulano issued Bitti a rushed mid-year performance review, rating her "Partially Meets Expectations" overall.

67.     The performance review included subjective, vague, inconsistent, and contradictory criticisms of Bitti's performance, as well as feedback completely antithetical to the superb reviews she had received since 2020.

68.     Vitulano pressured Bitti to review and acknowledge the performance review so that it could be processed by the Department's deadline.

69.     Vitulano told Bitti the two would discuss the review when Bitti returned to work from her time off for surgery on September 5.

70. On August 17, 2023, while Bitti was away at a pre-approved doctor's appointment, Vitulano emailed HR Business Partner Chase Jones ("Jones") a series of alleged performance issues Bitti allegedly exhibited in July and August.

71. From August 28 through September 5, Bitti underwent surgery and initial recovery.

72. On September 5, 2023, Bitti submitted a doctor's note from her surgeon, Dr. William Sabbagh, informing the Company that Bitti would be cleared to return to work on September 11, 2023.

73. Bitti submitted this note to Vitulano.

74. On September 12, 2023, Bitti requested PTO from September 12, 2023, through September 15, 2023, for additional necessary recovery time.

75. Vitulano yet again failed to inform Bitti of her right to elect to take this time off pursuant to FMLA.

76. On September 18, 2023, Bitti returned from her PTO for the surgery.

77. Following Bitti's return to work, she observed that Vitulano's demeanor towards her had worsened. Vitulano was short, cold, and impatient with Bitti. Prior to Bitti's medical condition and time off requests, Vitulano had treated Bitti well and called her a "good fit for the department."

### VITULANO ACCELERATES EFFORTS TO TERMINATE LINDA BITTI

78.     On October 3, 2023, Vitulano sent Bitti an email titled "Performance Review follow up," in which Vitulano flagged alleged "areas of concern" regarding Bitti's performance.

79.     Vitulano had previously approached HR Business Partner Jones on September 28, and the two collaborated on the email together.

80.     These "areas of concern" were completely unrelated to Bitti's actual work performance and included vague and often trivial reflections, such as Bitti allegedly failing to "take initiative and demonstrate autonomy" in her work, sending an "FYI" instant message to Vitulano at 5:15pm (outside of 9:00am to 5:00pm business hours), and having technical problems with her computer speakers at the beginning of a 1:1 meeting.

81.     Bitti was completely stunned and hurt by the negative feedback, as she was highly regarded at the company and was regularly encouraged to take more credit for her work accomplishments.

82.     Prior to requesting medical leave, Bitti had not received any negative performance feedback from Vitulano.

83.     In fact, Miller and Vitulano had awarded Bitti a 3% discretionary performance bonus in late July/early August for her performance in the first half of the year.

84.     Bitti immediately requested a meeting with Jones to discuss the content of the review. Bitti informed Jones that Vitulano's narrative was wholly inaccurate. She further confided in Jones that she believed she was meeting Vitulano's expectations, as she had continued to maintain her job duties and responsibilities. She told Jones she was confused as to where Vitulano's sudden frustration was coming from.

85.     On October 5, 2023—seventeen days after returning from her medical leave to recover from survery—Vitulano emailed Jones to terminate Bitti. Vitulano further insisted Bitti not be given the option of reassignment within the company, stating "I'm thinking giving [Linda] more time will just drag this out further, and I'm already really burnt out. What is the timeline to solidify options for severance?"

86.     On October 12, 2023, Bitti again met with Jones and informed him she felt Vitulano was treating her similar to a previous employee, Tawni Hanson, who Vitulano did not like because she took time off.

87.     On October 12, 2023, Vitulano emailed Jones, for a third time, determined to see Bitti terminated.

88.     On October 19, 2023, Jones emailed Bitti retroactively informing her of her right to have elected FMLA for her time off, doctor's appointments, surgery, and recovery.

89.     The next day, she was terminated.

### LINDA BITTI TERMINATED FOR "POOR PERFORMANCE," BUT INFORMED OF ELIGIBILITY FOR REHIRE

90.     On Friday, October 20, 2023, Vitulano rescheduled her and Bitti's weekly Monday 1:1 meeting to 4:00pm that day.

91.     Vitulano and Jones were present during the call. Vitulano informed Bitti that due to the feedback she had been receiving, the Company had decided to part ways with Bitti. Vitulano then turned the call over the Jones.

92.     Following this meeting, HR Jones informed Bitti that she was eligible for rehire within the company.

93.     The Renewals Manager role has not been filled since. Vitulano retaliatorily terminated Bitti from the position.

### COUNT I
### VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT RETALIATION

94.     Bitti incorporates by reference all the allegations contained above as though stated in full herein.

95.     At all times relevant hereto, Bitti was an employee and the Company an employer within the meaning of the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §2601, et seq.

96.     Bitti fell within the protection of the FMLA as a person with a serious health condition. 29 U.S.C. §2612(a)(1)(C). Bitti was entitled to job protections provided by the FMLA because she had a series of qualifying medical conditions,

namely: lumbar radiculopathy, lumbar spondylosis, inflammation of the sacroiliac joint, back muscle spasms, and general chronic low back pain, which require continuing treatment from a healthcare provider and caused a period of incapacity of more than three consecutive, full calendar days.

97.    Under the FMLA, the Company had an obligation to provide Bitti with up to 12 weeks of continuous or intermittent leave for a serious health condition which rendered Bitti unable to perform the functions of her position.

98.    The Company is prohibited under the FMLA from retaliating against Bitti for requesting and/or taking FMLA-qualifying leave.

99.    Notwithstanding Defendant's duties as set forth above, Defendant willfully violated the FMLA by terminating Plaintiff's employment for requesting and/or taking FMLA qualifying leave.

100.    As a direct and proximate result of the Company's violations of the FMLA, Bitti has and will continue to be deprived of wage loss, fringe benefits including but not limited to lucrative company options, status, seniority, and other advantages of employment.

**COUNT II**
**Violation of the Michigan Persons with Disabilities Civil Rights Act**
**Disability Discrimination**

101.    The PDCRA makes it unlawful for an employer to discriminate against a qualified individual because the individual has a disability, a record of a disability, or because the employer regards the individual as disabled.

102.    At all times relevant to this action, Bitti had a disability within the meaning of the PDCRA in that she was regarded by the Company as having a disability that substantially limited one or more of her major life activities.

103.    Notwithstanding this duty as set forth above, and in willful violation thereof, the Company discriminated against Bitti because it regarded her as disabled when it terminated her employment.

104.    The Company's stated reason for Bitti's termination is pretext for disability discrimination in violation of the PDCRA.

105.    As direct and proximate result of the Company's violations of the PDCRA, Bitti has and will continue to be deprived of wage loss, fringe benefits including but not limited to lucrative company options, status, seniority, and other advantages of employment.

106.    Accordingly, Bitti requests the following relief:

a)      An order reinstating Bitti to her former position or a comparable position;

b)      An Order of this Court awarding Bitti liquidated damages in accordance with the FMLA based on OneStream's willful conduct;

c)      An Order of this Court awarding Bitti compensatory damages in an

amount she is found to be entitled to;

d)      An Order of this Court awarding Bitti interest, costs, and attorney fees;

e)      An Order of this Court awarding Bitti such other equitable relief as this

Court deems just and equitable.

Respectfully submitted,

Pitt McGehee Palmer
Bonanni & Rivers, P.C.

By:  /s/ Bayan M. Jaber
Bayan M. Jaber (P85451)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI, 48067
(248) 398-9800
bjaber@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com

Dated:  March 19, 2024

UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LINDA BITTI,                                    Case No.

            Plaintiff,                          Hon.

v.

ONESTREAM SOFTWARE, LLC,

            Defendant.
_____

Bayan M. Jaber (P85451)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI, 48067
(248) 398-9800
bjaber@pittlawpc.com
dcanepa@pittlawpc.com
mpitt@pittlawpc.com
_____

**JURY DEMAND**

Plaintiff demands a trial by jury as to all issues raised in this action.

Respectfully submitted,
Pitt McGehee Palmer Bonanni & Rivers, P.C.
By: /s/ Bayan M. Jaber
Bayan M. Jaber (P85451)
Danielle Y. Canepa (P82237)
Michael L. Pitt (P24429)
Attorneys for Plaintiff
117 W. Fourth St, Suite 200
Royal Oak, MI, 48067
(248) 398-9800
bjaber@pittlawpc.com

Dated:  March 19, 2024

Page 24 of 24